David E. BRYAN, Jr.; Ebun Adelona, for herself and as mother and next friend for N'zinga; Altagracia Tejeda, for herself and as mother and next friend for Antonia; Celeste Feaster; and Minnie Winfree; Individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Edward I. KOCH, Mayor, City of New York; City of New York; New York City Health and Hospitals Corporation; Haskell Ward, Deputy Mayor and Chairman, Board of Directors, NYC Health and Hospitals Corporation; Joseph C. Hoffman, President, NYC Health and Hospitals Corporation; State of New York; New York Department of Health; David Axelrod, NYS Commissioner of Health; Richard Berman, Director, Office of Health Systems Management; and United States Department of Health, Education and Welfare, Defendants.

DISTRICT COUNCIL 37, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES UNION, AFL–CIO; Annie Norris; Robert Booth; Miriam Falcon; Daniel Edwards; Elizabeth Girodes, Plaintiffs,

v.

Edward I. KOCH, Mayor, City of New York; City of New York; New York City Health and Hospitals Corporation; Haskell Ward, Deputy Mayor and Chairman, Board of Directors, NYC Health and Hospitals Corporation; Joseph C. Hoffman, President, NYC Health and Hospitals Corporation, Defendants.

Naomi BOYD, Luz Medina, Luz Padilla, Elizabeth Smith, Citywide Coalition to Save our Hospitals, Community Coalition to Save Metropolitan Hospital, Coalition in Defense of Puerto Rican and Hispanic Rights, Community Coalition to Save Sydenham Hospital, Plaintiffs,

v.

Patricia HARRIS, Individually and in her capacity as Secretary of the United States Department of Health, Education and Welfare; Edward I. Koch, Individually and in his capacity as Mayor of the City of New York; City of New York; Health and Hospitals Corporation; Joseph C. Hoffman, Individually and in his capacity as President of the New York City Health and Hospitals Corporation; Department of Health, Education and Welfare, Defendants.

Nos. 79 Civ. 4274 (ADS), 79 Civ. 4329 (ADS) and 80 Civ. 2417 (ADS).

United States District Court,
S. D. New York.

May 23, 1980.

Jack Greenberg, Beth J. Lief, NAACP Legal Defense and Education Fund, Inc., New York City, for plaintiffs in Bryan v. Koch.

Beverly Gross, Karen S. Smith, Joel Giller, New York City, for plaintiffs, in District Council 37 v. Koch.

Herbert Semmel, Sanford A. Newman, Center for Law and Social Policy, Washington, D. C., for individual plaintiffs in District Council 37 v. Koch.

Louis B. York, Ramon J. Jimenez, Richard Clifford, Manhattan Legal Services Corp., New York City, for plaintiffs in Boyd v. Harris.

Allen G. Schwartz, New York City Corp. Counsel, New York City, by Bruce S. Kaplan, Norma Kerlin, Bradley Sacks, New York City, for City defendants.

Robert Abrams, New York State Atty. Gen., New York City, by Judith Gordon, Ann Horowitz, New York City, for state defendants.

John S. Martin, Jr., U. S. Atty., Southern District of New York, New York City, by William Hibsher, Asst. U. S. Atty., New York City, for defendants Patricia Harris and Dept. of Health, Ed. and Welfare.

## AMENDED OPINION

SOFAER, District Judge.

These actions all seek to prevent Mayor Edward I. Koch, and others, from implementing a plan to close certain municipal hospitals in the City of New York. At issue now is the closure of Sydenham Hospital, since the City has yet to decide whether other proposed closings should be implemented.

The defendant Health and Hospitals Corporation ("HHC") operates the City's municipal hospital system, which includes 13 acute care hospitals and four long-term care facilities for the treatment of the chronically ill and infirm. New York City's municipal hospital system is by far the largest system of its kind in the country.[1] The

1. The City's municipal hospital system contains 17 of approximately 27 municipal hospitals in the United States. (Wagner Aff. ¶ 6) In calendar year 1979, the system provided 242,288

hospitals in the municipal system provide health care to anyone who presents himself for treatment, without regard to ability to pay. Consequently, the budget of HHC constitutes over 10% of the total expense budget of the City of New York for fiscal year 1980—about $1.2 billion. In fiscal year 1980, the City of New York will contribute over $500,000,000 of tax funds to subsidize the operations of the hospital system. City Defendants' Trial Mem., p. 20.

Sydenham Hospital, located at 565 Manhattan Avenue near West 124th Street, is a provider of general, inpatient hospital care.[2] It is the smallest of New York's 13 acute care municipal hospitals. In fiscal year 1979, Sydenham admitted 3711 inpatients (1.5% of HHC's total), treated 25,690 emergency room patients (1.8% of HHC's total), and housed an average of 93 inpatients per day.[3] Sydenham serves primarily the population of the Central Harlem and West Harlem communities east of Morningside

inpatient admissions, 4,306,630 outpatient visits and 1,402,602 emergency department visits. The 13 municipal acute care hospitals are distributed throughout the City as follows:

| Manhattan | Bellevue |
|---|---|
| | Harlem |
| | Metropolitan |
| | Sydenham |
| Brooklyn | Cumberland |
| | Greenpoint |
| | Kings County |
| | Coney Island |
| Bronx | Lincoln |
| | North Central Bronx |
| | Bronx Municipal Hospital |
| Queens | Queens Hospital Center |
| | City Hospital at Elmhurst |

2. No obstetrical or specialized pediatric inpatient services are provided at Sydenham. But it does contain the largest specialized dental care clinic for children in the Harlem area. No highly specialized surgery such as neuro, thoracic, heart, or peripheral vascular, is performed at Sydenham.

3. Sydenham has three operating rooms. The Uniform Statistical Report, prepared by Sydenham Hospital for fiscal year 1979, shows that 1,355 surgical procedures were performed there that year—an average of fewer than four per day.

Heights. Most of the residents of these communities are black.

Plaintiffs contend that closing Sydenham would violate the equal protection clause of the Fourteenth Amendment to the United States Constitution, and Title VI · of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.[4] They represent three separate groups, two of which seek class certification.[5] On February 8, 1980, plaintiffs in the *Bryan* and *District Council 37* cases moved to enjoin the City defendants from closing Sydenham pending a full trial on the merits, or alternatively until defendants guaranteed inpatient and emergency services to the population served by Sydenham.[6] A lengthy hearing was held on this motion. Numerous witnesses testified. Affidavits supplemented the live testimony. And a massive record of exhibits has been compiled. The hearing ended on April 17, 1980. Post-hearing submissions continue to be made as of May 15, 1980.

4. Several statutory bases for relief are cited, but the merits turn entirely upon the Fourteenth Amendment and Title VI claims.

5. The class sought to be certified in *Bryan* is of all low-income black and Hispanic persons who depend on the municipal system for their health care needs. It seems clear that some form of class should be certified in *Bryan*, so there is no need to address whether a class should be certified in *Boyd*, or whether plaintiffs in *D.C. 37* have standing to make the claims they have advanced. The request of plaintiffs in *Boyd* to intervene in the *Bryan* and *D.C. 37* cases is granted to the extent that all three cases are hereby consolidated for purposes of the requests for preliminary relief. The plaintiffs in *Boyd* have accepted the hearing record compiled in *Bryan* as complete for purposes of their motion.

6. The requested preliminary relief is:
1. enjoining the closing of the inpatient services and emergency room of Sydenham Hospital, now scheduled for May 15, pending a determination after the full trial on the merits of the cases; or, alternatively
2. enjoining the closing of the inpatient services and emergency room of Sydenham Hospital until defendants demonstrate to the satisfaction of the Court that the population currently served by Sydenham has guaranteed access to inpatient and emergency room services provided without unreasonable burdens on black and Hispanic persons.

The Mayor has stated his intention to order Sydenham closed on May 16, 1980. The schedule that his decision compelled has been exacting. Under normal circumstances, a temporary restraining order would have been justified to permit the preparation and filing of detailed findings and conclusions.

But this is no ordinary case. It appears, rather, to be an effort by plaintiffs to use the federal courts as a last resort for delaying if not preventing the implementation by elected officials of a painful but purely political decision. Under these circumstances, to delay the closing of Sydenham for any period—particularly for the decision-making convenience of this court—would serve to undermine the authority and governing capacity of the City's responsible officials.

## I. *Standard for Preliminary Relief*

■ The Second Circuit has made clear that preliminary relief is appropriate only where the party seeking it shows possible irreparable injury. In addition, the moving party must establish:

> either (1) probable success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.

*E. g., Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206–07 (2d Cir. 1979).[7]

Defendants urge that relief be denied simply because no possible irreparable injury has been shown. This is so, if for no other reason than the fact that plaintiff's alternative request for preliminary relief—guaranteed access to inpatient and emergency services for Sydenham patients with-

out unreasonable burdens—has been demonstrated. *See* note 6, *supra*. In this case, however, the lack of merit in plaintiffs' contentions even more clearly mandates denying preliminary relief than the absence of irreparable injury.

## II. *Likelihood of Success on the Merits*

■ Plaintiffs present several claims. All relate ultimately to the contention that defendants have violated the rights of minorities in attempting to close Sydenham. Some clearly lack merit, such as the assertion by plaintiffs in *Boyd* that Sydenham must be kept open until the Department of Health and Human Services ("HHS") (formerly Health, Education and Welfare, "HEW") completes its investigation as to the City's compliance with Title VI.[8] Most are complicated claims, however, and so novel that pains have been taken to compile a record on issues which reviewing courts may see fit to address. In particular, this case requires federal courts to determine when the reduction of services to minorities by recipients of federal funds violates the Constitution and laws of the United States. The answers we give to this question are important in present times, when reductions in government services have become increasingly common, particularly in areas heavily populated by minorities.

### A. *Claimed Violation of Equal Protection*

■ The legal standard that governs relief under the equal protection clause of the Fourteenth Amendment requires proof that the challenged law or conduct "ultimately be traced to a racially discriminatory purpose." *Washington v. Davis*, 426 U.S. 229, 240, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597

---

7. Plaintiffs properly rely on *Sonesta Int'l Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973), but subsequent cases have made clear that possible irreparable injury is a necessary element of both bases for preliminary relief.

8. The agency itself makes no such claim. HHS has offered no evidence in this case of any violation by the City of any law, and, until the eve of this decision, carefully avoided taking

any position on the merits. Still it claims no violation of law or regulation but merely asserts the hospital should be kept open until HHS completes its study. Plaintiffs cannot claim that relief should be granted merely because HHS commenced and has not completed an investigation. Such an investigation may be based on nothing more than community and political pressure.

(1976). Discriminatory impact is insufficient in itself to support a conclusion of discriminatory purpose. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270, 97 S.Ct. 555, 566, 50 L.Ed.2d 450 (1977); *Washington v. Davis, supra*, 426 U.S. at 242, 96 S.Ct. at 2048. Furthermore, although the foreseeability of a racially adverse impact is still a proper consideration in determining discriminatory purpose,[9] a foreseeable adverse impact in itself is insufficient to prove discriminatory purpose. *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 n. 25, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979); *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979).

 Plaintiffs properly argue that these new standards, although demanding, permit parties to prove discriminatory purpose by inference from objective evidence. "Determining whether invidious discriminatory purpose was a motivating factor [requires] a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra*, 429 U.S. at 266, 97 S.Ct. at 564. "Proof of discriminatory intent must necessarily usually rely on objective factors," *Personnel Administrator of Mass. v. Feeney, supra*, 442 U.S. at 279 n. 24, 99 S.Ct. at 2296 n. 24 such as the fact "that the law [or practice] bears more heavily on one race than another," *Washington v. Davis, supra*, 426 U.S. at 241–42, 96 S.Ct. at 2049, the fact that the "actions [undertaken had] foreseeable and anticipated disparate impact . . . " *Columbus Board of Education v. Penick, supra*, 443 U.S. at 464, 99

S.Ct. at 2950, or the presence of proof of segregative intent based upon the particular history of the challenged decision, *Village of Arlington Heights v. Metropolitan Housing Corp., supra*, 429 U.S. at 266–68, 97 S.Ct. at 563–65.[10] Although these rules allow plaintiffs to attempt to prove discriminatory purpose without any direct evidence of such intention on the part of any, let alone all, relevant decisionmakers, the Court requires that the ultimate issue—racial animus—be kept in view. Discriminatory purpose "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Mass. v. Feeney, supra*, 442 U.S. at 279, 99 S.Ct. at 2296.

Plaintiffs claim they can prove discriminatory purpose in this case from evidence of (1) foreseeable adverse impact upon blacks and Hispanics by the closing of Sydenham; (2) the City's failure in deciding to close the hospital to adhere to substantive norms of health and fiscal planning; (3) the City's inconsistent application of its own criteria for selecting hospitals for closure, bed reductions, or mergers; (4) the City's reliance on erroneous data and arguments, even after "official criticism" by other health planning agencies; (5) the failure to consider feasible and less onerous alternatives; and (6) the City's alleged "nine months of evasion of a census of patients in the municipal hospitals," requested by HHS's Office of Civil Rights. See Plaintiffs' Post Hearing Mem., pp. 227–30.

### 1. Foreseeable Disparate Impact

Plaintiffs claim that data collected on the racial composition of persons who use Sy-

---

9. This appears particularly true in school desegregation cases, such as *Arthur v. Nyquist*, 573 F.2d 134, 142 (2d Cir.), *Cert. denied sub nom. Manch v. Arthur*, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978), where there exists something akin to a duty on the part of school administrators to avoid foreseeable, segregative results absent substantial, perhaps compelling, necessity.

10. Among the factors listed in *Arlington Heights* were:

(a) the historical background of the decision; (b) the specific sequence of events leading up to the challenged decision; (c) departures from the normal procedural sequence; (d) substantive departures; and (e) contemporaneous statements on the part of the decisionmakers. 429 U.S. at 266–68, 97 S.Ct. at 563–65.

denham and other municipal hospitals demonstrate that closing Sydenham will have a disproportionately adverse impact upon minorities, and that the City's hospital plan as a whole would, if implemented, have a disparate impact upon minorities. In making this claim plaintiffs proved a disparate impact of radically different meaning and significance than the disparate impact the Supreme Court has relied upon in jury-selection and other cases to prove discriminatory purpose.

Plaintiff's expert, a sociologist named Richard Faust, relied on several sets of data concerning proposed hospital or bed closings. Disputes as to the relative accuracy of these data sets have raged needlessly since this case was filed. No one disputes that approximately two-thirds of the patients who use the City's municipal hospitals are black or Hispanic. (Exh. 12, 13) Furthermore, virtually all the patients who use Sydenham are minority. Faust took these facts, among others, and designated the beds in all municipal hospitals, including Sydenham, in accordance with the racial proportion of patients. Thus, if a hospital had 1000 beds and 80% minority patients, 800 of its beds were designated minority beds. Faust then calculated the total number of minority beds that were scheduled to close in the Mayor's Plan, and compared that number to the proportion of minority beds that would have been "expected" to be reduced if the percentage of minority beds to be reduced were the same as the proportion of minority beds in the municipal hospital system. He found, regardless of what data set he used, that more minority beds were proposed for reduction by the Plan than would have been expected had reductions been in the same proportion as minority beds in the municipal hospital system. He then treated this difference as a disparity—or, as plaintiffs contend, a disparate impact—and proceeded to calculate the likelihood that the disparities found could have been the result of random distribution. In every case analyzed he found disparities of at least two standard deviations from the expected distribution, and in several cases he found disparities in excess of ten standard deviations. (Exh. 57e–g, 91)

Defendants' expert, a statistician named Dr. William B. Fairley, made clear how little utility plaintiffs' data possess. To utilize the data presented by plaintiffs on the issue of discriminatory purpose, Dr. Fairley explained, one would have to assume that the decisionmaker whose motivations were under scrutiny made individual, independent decisions to reduce beds in the system or in any hospital studied. A finding of discrimination may theoretically be inferred from a highly improbable selection of minority beds for reduction. But to draw such an inference the selection of beds must be as independent, one from the other, as the selection of jurors in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), *Swaine v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), or as the selection of teachers for assignment in *Board of Education v. Harris*, 444 U.S. 130, 100 S.Ct. 363, 62 L.Ed.2d 275 (1979). *See* Finkelstein, *The Application of Statistical Decision Theory to the Jury Discrimination Cases*, 80 Harv.L.Rev. 338, 374 (1966). The relevant statistical technique is the binomial model, in which one of two choices is made over and over again, creating the basis for testing the probability of the distribution of some total number of independent, individual choices. *See, e. g.*, F. Mosteller, R. Rourke & G. Thomas, *Probability with Statistical Applications* 132–33 (2d ed. 1973) (Exh. O).

The Mayor and his administrators in this case obviously made no decisions respecting individual bed reductions. They proposed hospital closings, and multiple bed reductions in specific hospitals. Therefore, any effort to infer motive from the effects of such decisions on individual beds is untenable.

Mr. Faust conceded his analysis had no value in ascertaining a decisionmaker's purpose. He and plaintiffs contend, however, that the analysis is a useful demonstration of the degree to which minorities would be affected by the Mayor's Plan, relative to whites. This would appear, in some crude

sense, to be true, and some authority exists for utilizing the binomial model, even though independent decisions could not be assumed, "as a baseline for comparative purposes. . . ." *F. Mosteller et al., supra,* at 133–34. But the dangers in so simplistic an approach are substantial, as the circumstances of this case illustrate.

■ When properly analyzed, the data plaintiff advanced to prove disparate impact in fact tend to negate any intent to discriminate. Dr. Fairley illustrated this with three different models of statistical analysis: Fisher's Exact Test, the Mann-Whitney Test, and the Permutation Test. These models tested with differing degrees of sophistication whether the limited number of decisions proposed by the City concerning hospital closings or major bed reductions are consistent with results that could have been obtained by random selection. No effort has been made to controvert Dr. Fairley's convincing analyses, all of which showed that the proposals in the Mayor's Plan could reasonably have been reached by random selection, thereby tending to negate the hypothesis of discriminatory intent. *See* F. Mosteller & R. Rourke, *Sturdy Statistics* 194, 56, 268–69, 12–14 (1973). (Tr. 934–86, 1485–87)

Furthermore, as Dr. Fairley explained, any effort to find significance in the limited set of data in this case is suspect. Few choices were available to the Mayor's Task Force in this case; thus very large apparent differences in the effects of their decisions were relatively insignificant as proof of their intent. (Still fewer choices were available to the Mayor.) By contrast, for example, when thousands of jurors are being individually selected, even apparently small differences may produce significant results. Moreover, the nature of the decisions involved in this case is such that testing them against an hypothesis of random distribution is peculiarly inapt. In a typical jury selection case, the decisionmaker is presented with few variables, all relatively simple to apply (such as ascertaining a prospective juror's residence). One would expect, therefore, that the consequence of jur-

or selections will be a pattern of decisions consistent with a random selection process. Decisions to close hospitals, by contrast, or to reduce the number of beds in hospitals, are not the sort of judgments one would necessarily expect to find exercised in a manner consistent with randomness. Rather, one would expect that such judgments are made on the basis of a process far more complex, and involving many more variables. In this context, a proper test of statistical significance based on a random distribution hypothesis may produce "interesting" results, as Fairley put it, but of significantly less value than the results of a less complex set of decisions. (Tr. 1501)

A further danger in the inapposite use of binomial analysis, even as a crude measure of impact on minorities, is that the impact observed may affirmatively mislead as to the decisionmaker's motive. The decision to close Sydenham is only one of literally thousands of individual budgetary determinations by which the City's available resources are distributed. Any meaningful inquiry to determine motivation in such a context would require an evaluation of whether City funds are being measurably reallocated away from services to minorities. The proposed Sydenham closing may well be part of an overall reduction in city expenditures, for example, that falls more heavily on services to whites, and allocates more funds proportionately (even if less absolutely) to services from which minorities predominantly benefit.

Finally, the Court's decision in *Personnel Administrator of Mass. v. Feeney, supra,* is instructive in evaluating the sort of data plaintiffs present. The veterans preference law challenged in that case had the effect of excluding almost all women from eligibility for certain jobs. This disproportionate impact, however great, could not be deemed probative of improper purpose, the Court concluded, because a believable and historically accepted explanation for the statute was available—the policy of preferring veterans. The result of disadvantaging women may have been foreseeable, but this proof was inadequate in light of an

altogether believable, non-discriminatory motivation. Here, too, non-discriminatory motives plainly exist—fiscal necessity and health planning among others. Unless these motivations are refuted by other indicia of discriminatory purpose, the alleged disparate impact is entitled to little, if any, weight.

### 2. Other Evidence of Discriminatory Purpose

Plaintiffs' other arguments concerning discriminatory purpose are all related to the manner in which the City has planned and implemented the closing of Sydenham. The searching evaluation which plaintiffs have made of the City's plans, projections and conduct has revealed imperfections, errors, and perhaps excessive combativeness on the part of the City's representatives. But such shortcomings are inevitable, given the limitations under which City planners work, the need for swift judgments on the basis of imperfect data, and the enormous political pressures that have been brought to bear upon the City to prevent its plan from taking effect.

The context in which the City developed and promulgated the Mayor's Plan is uncontroverted. A grave fiscal crisis was widely recognized to exist in New York City in 1975. The City's budget was estimated to be from $6 billion to $9 billion in overall deficit, approximately $2 billion attributable to that year. Further deficits were anticipated. The City was threatened with bankruptcy when it was denied access to normal channels of credit. (Tr. 1352–53)

Severe fiscal constraints followed. As the City's budget was cut, thousands of municipal employees were dismissed. The City became obliged to plan for further reductions, with a view to achieving a balanced budget by fiscal 1981. The Emergency Financial Control Board was created to review the City's plans and to monitor its compliance with them.

At the center of the City's efforts to plan for its necessary retrenchment has been its Office of Management and Budget ("OMB"). Its Deputy Director, Paul Dickstein, testified that, despite substantial cuts in other service areas, HHC had suffered relatively inconsequential reductions in support as of 1978. In addition, by November 1978 it became clear that HHC had overstated its revenues, and would require $60–$80 million in additional tax levy funds. This came on top of an already projected City budget gap of $400 million for fiscal 1980. Despite this, in its January 1979 Plan to Eliminate the Budget Gap, the City proposed to eliminate $250 million in spending without any cuts at HHC. But the difficulty of cutting further from the relatively small amount of discretionary spending in the City budget, and the severe cuts already imposed upon other essential services, such as the police and fire forces and the Board of Education, led OMB to establish a program under which HHC would seek to eliminate its fiscal 1980 deficit of $60–$80 million by reducing personnel costs and increasing revenues. (Tr. 1357–64) Reducing the HHC was not only imperative, it was equitable.[11]

Serious efforts began, principally at OMB, to reduce the HHC budget. Planning officials determined from widely accepted data that the City hospitals had an "overbedding" problem; the occupancy rate at all acute care municipal hospitals was averaging 75%, 15% below the desirable rate. (Tr. 1369) Furthermore, OMB concluded that dollar savings would be maximized by the closure of entire facilities, rather than haphazard service reductions or random bed closures. (Tr. 1370) Such drastic measures required lead time and planning, and a health-policy working group was formed.

In April 1979, Mayor Koch stated publicly that 3,500 excess beds in the voluntary and municipal sectors had been identified. (Tr. 1385–86) He formally created the Mayor's

11. For example, while from the onset of the fiscal crisis the citywide workforce had been reduced by 23 percent, HHC, with a declining patient workload, had only reduced its workforce by 9½ percent. (Tr. 1365)

Health Policy Task Force to undertake a study and render a report presenting recommended actions designed to reduce health care costs and increase the efficiency of the overall health care delivery system. (Exh. 1, Letter of Haskell Ward to Mayor Koch, June 19, 1979.) Meanwhile, it became clear that the $30 million spending reduction by HHC for fiscal 1980 was not going to be achieved; that spending reductions of only about $6 million were possible. (Tr. 1365) This development served to underscore the need for savings generated by the closure of entire hospitals.

On June 20, 1979, the Task Force published the Mayor's Plan. It is an extensive document, establishing a methodology, marshalling data, and reaching conclusions based on that data. Fiscal necessity was predictably one of the report's major concerns, if not its reason for being. Finding an excess of 2,914 beds city-wide, the Report purported to apply the following criteria in determining whether to recommend closure of any hospitals (Exh. 1, p. 56–57):

> Municipal hospitals were thus further analyzed in terms of relative performance and contribution to boroughwide services. Recommended for closure or for management contracts were those municipal hospitals with disproportionately high per-bed or per-patient-day operating deficits in relation to other municipal facilities, those with obsolescent plant, and/or those within 30 minutes of other municipal hospitals with comparable or broader services. Absorptive capacity among nearby municipal hospitals was a critical factor in making recommendations for closure or nonclosure.

The Report concluded that two municipal hospitals, Sydenham and Metropolitan, should be recommended for closure. Applying the criteria it established, the Panel found that Sydenham in particular ranked consistently high among the municipal hospitals in cost per day of inpatient care; that Sydenham's extraordinarily low Medicaid rate (now 51% of cost) imposes substantial operating deficits on New York City (which must be offset with tax levy funds); that

Sydenham is the oldest and most obsolescent hospital in the City system; and that reasonable access for Sydenham patients to alternative hospitals was assured. The Report projected that the City would save $3.245 million beginning in fiscal 1981 if Sydenham were closed.

On June 28, 1979, the Report's recommendations were adopted for implementation by the Board of Directors of HHC. Nevertheless, the closure recommendations could not be implemented without the Mayor's approval. Thus far, the Mayor has approved only the closure of Sydenham, and has proceeded to comply with applicable state laws governing such closures.

Plaintiffs find many faults in the City's plan. One of its witnesses equated it with garbage. (Tr. 192) Rhetoric is no substitute for logic, however, and while many of plaintiffs' criticisms have some merit, they are in fact levelled at the quality of the city's work rather than probative of its motivation.

Thus, plaintiffs complain that the Report failed to address "the systematic woes plaguing the Corporation" or "the basic reasons for the Corporation's financial picture." Plaintiffs' Post-Hearing Mem., p. 58. But the Report recognized that the City is laboring under a system that requires it to pay a large percentage of health services costs funded through Medicaid, and to pay the entire cost of persons ineligible for Medicaid and without private insurance, as well as the costs of caring for aliens, and the costs of a growing elderly poor population. (Exh. 1, p. 16) Plaintiffs are hardly persuasive on the issues in this case, let alone realistic in evaluating the City's power, when they flatly assert: "Defendants may have no control over the age of its citizenry, or its lack of medical coverage, but they presented no evidence as to any efforts to work with the State to modify the fiscal burdens imposed on the City by these factors." Plaintiffs' Post-Hearing Mem., p. 59.

Nor do plaintiffs contribute anything to their cause by claiming that the City should have worked on HHC's problems by improv-

ing collections, monitoring quality of care, setting up an efficient system of supplies, "hiring personnel," "launching new programs," and avoiding unnecessary duplication of services. Indeed, some of the alternatives suggested by plaintiffs are beyond the City's legal authority to implement.[12]

The Report's criteria, all admit, would render many hospitals eligible for closing. But how does this show that the decision to choose Sydenham was so unreasonable as to reflect improper motive? In fact, Mr. Dickstein's testimony that his entire staff selected Sydenham as an appropriate hospital for closure, without any discriminatory purpose, is entirely believable, as was his extensive description of the steps through which he and his staff had gone in arriving at an entirely rational, nondiscriminatory determination. In this regard, the testimony of plaintiffs' witness Dr. Lou Ann Kennedy was impressive. It may well be that modern, humane health planning should be based on community needs for medical services, not exclusively on other criteria such as the level of existing demand at particular institutions. (Tr.73–81) Yet, Dr. Kennedy admitted that the Report's methodology relied upon standards of health care planning that are still generally accepted, however inadequate they may seem. (Tr. 605, 608, 644–46) Indeed, she conceded that data are presently unavailable for needs-based

planning, and that the City is necessarily subject to irrational and unfair state laws and reimbursement formulae. (Tr. 101, 125–26, 614–16, 643–46, 653)

The City's failure to assure alternative access to health services, plaintiffs argue, is yet another piece of evidence from which racial animus should be inferred. They claim that the City has relied on public transport schedules that tend to underestimate travel time, and have not taken into account the problems of the aged and disabled. They argue that, particularly in recent months, the absorptive capacity of some of the hospitals which would be available to treat Sydenham patients had diminished to low levels. Furthermore, they argue that inadequate facilities exist to absorb Sydenham's emergency population, that some emergency cases will result in serious injury or death if Sydenham closes, and that addition ambulatory services cannot provide substitute care for Sydenham patients.

■ The travel time standards seems an entirely reasonable way to determine access, however, and the City has offered reasoned presentations as to where Sydenham patients could be served upon closure without significantly increased travel time. (See Exhs. T; V, prepared by Peter Klemperer and his accompanying testimony.)[13]

12. Plaintiffs argue that a merger between Sydenham and Harlem Hospitals would have been a more cost-effective alternative to closing Sydenham. According to plaintiffs, after merger of the two hospitals, Sydenham would significantly increase its revenues from Medicaid reimbursements, because the higher ceilings the State sets for reimbursement of certain hospital costs would be applicable. Assuming that Harlem's present reimbursement rate would apply to Sydenham after merger, plaintiffs' witness, Mr. Cuite, estimated that Sydenham would receive a minimum of $1,149,011 in additional annual Medicaid revenues. (Tr. 999–1003, Exh. 82) Moreover, plaintiffs contend, merger of the two hospitals would result in a better coordinated, more efficient system. Plaintiffs' suggested alternative is too speculative and contingent. Even assuming that the merger plan complied with the demanding requirements of Section 86–1.38 of the State's Health Administrative Rules and Regulations, 10 NYCRR 86–1.38, approval of the plan appears to be within

the discretion of the State Commissioner of Health. Moreover, even if a merger were approved, it is not at all certain that the Commissioner would also approve a sufficient increase in Medicaid reimbursement allowances. Criteria for establishing individual reimbursement rates are numerous and apparently subject to repeated reformulation. Finally, based on the evidence presented, the City could reasonably have concluded that, even if a merger could be effected, it would be less efficient than closing Sydenham.

13. In 1978, Peter Klemperer and his staff conducted a patient origin study. (Tr. 784) Data for this study were collected in a statistically reliable manner (Tr. 921–23) from the hospital admission card, a document completed on a routine basis and hence a good data source. (Tr. 788) From the addresses contained on the patient admission cards, the relevant patient health areas were determined, and matched to transportations zones determined according to

Some hospitals on which Sydenham patients would have to rely seem close to or at

capacity.[14] With relatively few exceptions, however, defendants do not dispute plain-

the City Planning Commission's grid map (UTPS). (Tr. 804, 807, Exh. S) Using a 1979 computer printout from the Department of Transportation indicating travel times, Mr. Klemperer and his staff calculated travel times from the relevant health areas to Sydenham and other hospitals. (Tr. 807–8) The study assumed (a) that all patients from a single health area would go to the same hospital, (b) that certain hospitals, including Metropolitan and hospitals on Manhattan's East Side, would not be used, and (c) that six to seven percent from each health area would go to a municipal rather than a voluntary hospital (Tr. 812), which percentage reflected the number of non-paying patients at Sydenham according to HHC records. Under the Manhattan construct, which included Joint Diseases, average travel time to an alternate source was 13.6 minutes (Tr. 814), and under a second construct, which excluded Joint Diseases, average travel time was 15.2 minutes (Tr. 814); the first represented a decrease in travel time for Sydenham patients of 31 percent, and the second a decrease of 23 percent. (Tr. 814, 823) Under the Bronx construct (Exh. U) only 20 patients had to travel more than 30 minutes to reach an assigned hospital.

Plaintiffs argue that defendants' travel time analysis ignores the fact that 70 percent of all emergency patients and at least 80–85 percent of drug overdose cases walk in or are carried into Sydenham's emergency room by persons who have walked. (Tr. 139, Keeling Aff. p. 2) Moreover, plaintiffs argue, because many of the people who accompany an emergency patient seek to avoid identification and to minimize their involvement, they would be greatly discouraged from assisting people if such assistance called for the use of public transportation.

This argument is unconvincing. That some patients who now walk to Sydenham may be inconvenienced by the necessity of taking public transportation is not in itself enough to find legally cognizable adverse effect, let alone racial animus. Cf. United States v. Bexar, 484 F.Supp. 855 (N.D.Tex.1980). And, while some people may be discouraged from assisting emergency patients, this possibility must be viewed in light of the established fact that life-threatening emergency cases account for only five percent of the already small number of emergency cases handled by Sydenham, and that sufficient ambulance service has been assured. See note 21, infra. Finally, testimony was given suggesting that drug overdose victims are brought to the hospital because addicts have established "shooting alleys" near it; this activity may shift closer to open emergency rooms. (Tr. 163)

14. According to the Mayor's Plan, Sydenham's patients would be accommodated by six hospitals within thirty minutes travel time of Sydenham. The six alternative hospitals are Bronx Lebanon (Concourse Division), Harlem, Joint Diseases, Mt. Sinai, Presbyterian, and St. Luke's, which, according to the Plan, have occupancy rates ranging from 75 to 91 percent. (Exh. 1, p. 103)

Plaintiffs dispute the validity and relevance of the Plan's average occupancy rate computations, which, they contend, were based on 1978 occupancy data. In particular, plaintiffs maintain that for calendar year 1979, three of the six alternative hospitals, Joint Disease, Mt. Sinai, and St. Luke's, have average medical-surgical bed occupancy rates of 91.4, 94.8 and 91.1 percent respectively, all in excess of the 90% inpatient rate which the Mayor's Plan acknowledges as the generally used maximum rate for municipal hospitals. They further urge that the latest available data indicate that the rates for these three hospitals, as well as hospitals citywide, have risen even higher, to points at or near capacity levels. The receipt of additional inpatients from Sydenham which the City Plan projects would, they contend, exacerbate the already too high occupancy rates. For example, based on the 1979 figures, Joint Diseases would have an average occupancy rate of 95 percent, and St. Luke's, 96 percent.

While plaintiffs' statistics suggest that hospitals are operating at or near capacity levels, it is important to evaluate their figures in context. First, it appears that many hospitals attempt to maximize their occupancy rates by eliminating beds so as to increase the applicable state reimbursement rates. (Tr. 244–45) Second, occupancy rates are normally determined according to the number of general medical-surgical beds in a hospital and thus do not reflect the availability of specialized beds which would be able to receive Sydenham patients. Because of Sydenham's small size, 104 of its 107 beds are certified as "medical/surgical" beds, i. e. for general medical and surgical care. In larger hospitals, while most beds are certified as "med/surg", there are also beds certified for such specialties as "pediatrics", "obstetrics", "mental hygiene" and "psychiatry." Sydenham treats some patients with problems falling into all these categories (other than obstetrics), and thus, after closure, some of Sydenham's patients could be treated in beds other than "med/surg" at other hospitals. Finally, the evidence strongly suggests that many inpatients at Sydenham are kept in that hospital only because social service agencies fail to place them in other, more appropriate facilities. (Tr. 1973–76) These individuals will not need to be transferred to hospitals.

tiffs' figures as to average hospital occupancy rates in their effort to justify the Plan's projections and assumptions. Rather, they correctly point out that, even if some of the hospitals are operating above the recommended 90 percent maximum rate, the six hospitals as a whole will be able to accommodate the additional ten admissions per day (or daily total of 93 inpatients), which Sydenham's closing could necessitate. In particular, there is strong evidence to support the City's assumptions that Joint Diseases will remain open and could be expanded;[15] that Presbyterian Hospital alone, which is presently underutilized, could absorb Sydenham's entire patient workload;[16] and that some Sydenham patients will be able to use hospitals in the Bronx and Brooklyn, where they reside.[17] Nor do plaintiffs controvert the City's proof that the Sydenham emergency department is very small (70 visits per day), that it is inadequate for routinely treating life-threatening conditions, and that it is largely utilized for ambulatory care.[18] Non-urgent patients, the City argues, are better cared for at the Sydenham Neighborhood Family Care Center ("NFCC"), the operational hours of which have now been expanded in

---

15. The Mayor's Plan assumes that approximately 25 percent of Sydenham's patients would go to Joint Diseases and that Sydenham's operating certificate for seventy beds would be reallocated to Joint Diseases. Plaintiffs contend that Joint Diseases is not a reliable alternative since it is already operating at over 90 percent of capacity, and its future financial viability is in serious doubt. But plaintiffs overlook the persuasive testimony of their own witness, Mr. Mark Baker, Joint Diseases' Executive Director, who stated that effective measures are currently being implemented to remedy the hospitals' financial difficulties. (Tr. 250–52) Moreover, Mr. Baker testified without contravention that Joint Diseases' physical plant can easily accommodate 70 additional beds above the 200 now operated, and that the hospital would in fact operate more cost-efficiently with 270 beds. (Tr. 236–38, 243) Finally, to improve it payor mix, Joint Diseases would especially welcome additional Blue Cross and Medicaid patients from Sydenham. (Tr. 246)

16. The HSA Report notes that Presbyterian, which has an affiliation agreement with Harlem Hospital, had only an 81.9 percent overall occupancy rate during 1979 for its 1291 beds (Exh. 39–A, pp. 638–39), and that Presbyterian will continue to play an important role in Northern Manhattan. The Mayor's Plan shows estimated travel times from Sydenham to Presbyterian of between 21 minutes and 25 minutes, depending on the time of day or night. (Exh. 1, p. 255) Plaintiffs have offered no contrary evidence. And, while the two constructs prepared by Peter Klemperer (Exhs. T, V) project only one or two new admissions per day at Presbyterian after Sydenham's closure, a substantial number of patients reside in a "swing" area (health areas 14, 11, 19 and 15) which is almost equidistant from St. Lukes, Presbyterian and Harlem hospitals. (Tr. 818–819) Thus with almost no difference in travel time, many additional Sydenham patients could go to Presbyterian Hospital.

17. Ten percent of Sydenham's patients now reside in the Bronx where there is more than sufficient excess hospital capacity. In addition, another ten percent of Sydenham's patients reside in Brooklyn, Queens and Lower Manhattan, which also have considerable unused bed capacity.

18. By the hospital's own assessment, the Sydenham emergency department has inadequate facilities for the routine treatment of life-threatening emergencies. (Poliafico Aff. ¶ 8) For example, only one treatment room of approximately 160 square feet is equipped and available for a cardiac arrest, multiple trauma or emergency surgical procedure. (*Id.*, ¶ 18 referring to Exh. F, p. 10, attached thereto.) Because of its limited facilities, Sydenham administrators characterized the department as a "general emergency department" for purposes of evaluation by the Emergency Medical Service Systems, thus acknowledging its inability to treat routinely critical emergencies. Indeed it is not at all clear that Sydenham even meets the requirements of a "general emergency department." On April 11, 1980, apparently based on the department's deficiencies and the availability of better emergency treatment in nearby hospitals (*id.* ¶ 21), the E.M.S. System's Matrix Committee recommended that Sydenham not be included in the Northern Manhattan ambulance matrix. (*Id.* ¶ 20) If this recommendation is not reversed, no ambulances or emergency vehicles will be directed to Sydenham. (*Id.*) Furthermore, it is undisputed that true life-threatening emergencies comprise only a small fraction—as low as perhaps five percent—of total Sydenham emergency visits. (*Id.* ¶ 17; Tr. 1683; Exh. 1, p. 158), and that urgent cases comprise only ten percent. (Exh. 1, p. 158) The remaining 85 percent of the cases could be handled in a less sophisticated medical facility. (Pfost Aff. ¶¶ 8–11; 32)

anticipation of Sydenham's closure. (Kelsky Aff. ¶ 2) In addition, the City intends to expand the Washington Heights NFCC, to absorb and more effectively serve non-emergency patients in Harlem. (Pfost Aff. ¶ 9) [19]

Some true emergency patients who would have been served at Sydenham will have to be transported to nearby emergency rooms.[20] Emergency ambulance services exist,[21] and most such patients will therefore quickly obtain the necessary care. Nevertheless, closing Sydenham will have adverse consequences in some cases, particularly those involving serious gunshot and knife wounds and advanced drug overdose victims.[22] But the number of such cases will be small, and the Sydenham community will be no more disadvantaged in this regard than most other communities in the City, which presently do without the special benefits of a neighborhood hospital. Furthermore, these isolated consequences must be weighed against the City's reasonable claim of better and more cost-effective delivery of health care throughout the system for many residents. Finally, as unfortunate as some of the anticipated consequences of closure may be, they are probably less serious than those that would flow from almost any other municipal hospital closing. Certainly they provide no basis for

19. The City has also undertaken to create storefront, satellite, ambulatory care clinics and to reorganize Harlem's ambulatory care into a "primary care network." (Pfost Aff. ¶¶ 9–11) The network is to consist of two clinics in housing projects and two storefront clinics located on major Harlem streets (Pfost Aff. ¶ 14), as well as an outreach program to emphasize the delivery of primary care services. Not only will these clinics improve available health care, they will also deliver these primary care services in a low cost setting (Pfost Aff. ¶ 15), in furtherance of the National Health Planning Objectives.

20. Emergency facilities will, for example, be available at both Joint Diseases, located approximately five or six blocks from Sydenham (Tr. 249), and St. Luke's, approximately ten or eleven blocks away. The evidence established that both of these hospitals have emergency rooms that are substantially better equipped than Sydenham's department and could easily absorb the number of urgent and life-threatening cases now served by Sydenham. Joint Diseases' emergency room handles approximately 50 to 52 cases per day, of which 25 percent are true emergencies. (Tr. 247) St. Luke's emergency room, which handles from 250 to 500 patients per day (Tr. 290), could take on an additional 50 patients from Sydenham. (Id.) It should be noted that, according to New York State Public Health Law § 2805-b, no emergency department may refuse emergency medical care to anyone in need, regardless of ability to pay. In light of the availability of emergency room treatment at both these hospitals, it is unnecessary to determine whether plaintiffs are correct in their assertion that Harlem Hospital's emergency room is operating at capacity levels and could not absorb any additional patients.

21. Contrary to what plaintiffs contend, it is not at all clear that emergency ambulance service in the Northern Manhattan area has decreased in the past two years. Although some reductions in the system seem to have been made, (Tr. 345, 372–3) many other changes seem to be improvements. (Murray Aff. ¶ 13) For example, seven Advanced Life Support ("A.L.S.") ambulance tours now patrol the Harlem area compared with only two in July 1978. (Murray Aff. ¶ 12) These ambulances are staffed and equipped to provide on the scene emergency medical treatment such as intravenous infusion of fluids and medications (Tr. p. 338), including NARCAN, to narcotic overdose victims. (Poliafico Aff. ¶ 23)

Furthermore, if Sydenham Hospital is closed, the E.M.S. Operations Center in Masbeth, N.Y. will closely monitor the emergency call density in Sydenham's area. If, after a data analysis, the need for an additional ambulance unit is identified, every effort will be made to meet that need. (Murray Aff. ¶ 15) When Logan Hospital closed in February 1979, E.M.S. responded immediately by increasing the number of ambulance tours in Northern Manhattan. (Murray Aff. ¶ 10)

22. A significant concern on the part of plaintiffs relates to the treatment of drug overdose victims. Plaintiffs contend that many of these patients are "walk-ins," who often locate themselves near the hospital to be able to obtain fast emergency treatment in the event of an overdose. The closing of Sydenham will not necessarily prevent such cases from obtaining adequate care, however, since "shooting alleys" may be relocated. See note 13, supra. It is undisputed that other hospitals in the area also treat overdose victims. (Tr. 166) Moreover, the record indicates that ALS ambulances as well as the NFCC are equipped to administer a drug named NARCAN, a highly effective emergency medication which counteracts the effects of opium, heroin and other drugs, and can immediately revive a comatose overdose victim. (Tr. 133)

an inference of racial animus in this context.

Plaintiffs seem to rely more heavily on the Report's recommendation that Metropolitan be closed than on the decision to close Sydenham. In fact, the justifications for closing Metropolitan are less convincing than for closing Sydenham, and if Metropolitan were closed a far more serious problem of access for minority patients would be presented. Those arguments have no strength at this time, however. The Mayor has thus far refused to close Metropolitan. If and when he should choose to attempt to close the hospital, plaintiffs will be free to assert whatever claims they may have as a result. The suggestion that the Report's recommendation to close Metropolitan was so unreasonable as to prove discriminatory purpose is weak, even assuming its relevance to the City's present motive. And it would be perverse to ignore the City's decision to reconsider closing Metropolitan in order to permit the argument that the earlier recommendation reflects racial animus.

Plaintiffs also argue that the City's conduct after the Report was published reflects discriminatory purpose. One must strain mightily, however, to find evidence of racial animus in the City's refusal to accept entirely the criticisms made of its approach. Genuine differences of opinion appear to exist on some issues between the City and its critics, such as the number of excess hospital beds,[23] or the amount of savings that will be realized by closing Sydenham.[24]

23. The Health Systems Agency ("HSA") report took the position that the City had overestimated the number of excess hospital beds. (Exh. 39a, p. 3) But compare that statement, for example, with HHS's reiteration of the widely held view, in a letter dated February 15, 1979 to President Joseph C. Hoffman of HHC, that it is "essential that a program of hospital bed closures be pursued vigorously." (Attachment 2 to Cheatham Aff., in *Boyd v. Harris*)

24. In June 1979, the Mayor's Health and Policy Task Force Plan projected a savings from closing Sydenham of $3.245 million for fiscal year 1981. (Exh. 1, p. 138) Defendants claim that events since June 1979, including the failure to meet revenue targets (Tr. 1622–26), the reduction in the 1980 Medicaid rate (Exh. 88; Tr. 1601), and the recognition that the estimated expenditure reduction *would not be achieved* (Tr. 1416), have caused them to revise their estimate of savings. Defendants' Post-Trial Mem., pp. 57–58. They now claim that over $8 million can be saved in fiscal year 1981 if Sydenham is closed. (Exh. LL, Tr. 1603)

Plaintiffs criticize, at length, the accounting methods used by the City in calculating the projected savings. They claim, *inter alia*, that defendants erred in using a straight-line projection of collections in the first eight months of fiscal year 1980 despite the fact that collections are likely to increase in the last months of the fiscal year. Plaintiffs' Post-Hearing Mem., pp. 97–99. They argue further that *defendants overstated the negative effect* of Sydenham's Medicaid adjustment for 1979–80, *id.* at 99–100, that defendants' estimate of appeals and settlements at Sydenham is indefensibly low, *id.* at 100–02, that defendants have inflated direct expenditures at Sydenham, *id.* at 102, and that defendants failed to account properly for retained expenditures and for expenditures relating to the closing of Sydenham, *id.* at 104–06. Plaintiffs also claim that defendants overstated the revenues that will be retained by the municipal hospital system due to the transfer of Sydenham patients to other municipal hospitals; they argue that in calculating this figure, defendants did not consider all the self-pay cases or Medicaid patients whose claims are rejected, and that defendants did not account for the existence of a new state Medicaid regulation which allows reimbursement for only a small percentage of the Medicaid rate for a certain volume of increased Medicaid days. *Id.* at 106–11. Finally, plaintiffs assert that defendants ignored the additional cost to the City of transferred patients at voluntary hospitals. *Id.* at 111–14.

Defendants vigorously respond to plaintiffs' criticisms. Defendants' Reply Post-Trial Mem., pp. 12–20. At a minimum, *defendants' counter* arguments establish that their estimates were reasonable under the circumstances, thus permitting no inference of racial animus.

That differences in accounting estimates in this case, as in many cases, are subject to reasoned dispute is demonstrated by defendants' strong criticisms of the estimated savings projection prepared by plaintiffs' expert, Mr. Thomas Cuite. (Exh. 84) Defendants point out that Mr. Cuite used an outdated Medicaid rate, thereby underestimating savings. They also argue that, since plaintiffs do not gear their savings estimate to a particular year, their inclusion of one-time non-recurring costs is misleading. They point out further that Mr. Cuite admitted that he did not inflate costs, failed to include collective bargaining increases, and erred in selecting a base expenditure amount from the November 30, 1979 Sydenham Hospital Fiscal Year 80 budget. Finally, they note that Mr. Cuite treated all self-pay patients as no-pay patients despite the fact that a signifi-

With respect to some of the other criticisms, the City seems in fact on firm ground for staunchly maintaining that its position is superior to that of its critics.[25] Who is to say that some other criticisms, including the recent conclusions of HHS, are not the product of political considerations or outright cowardice? Finally, the City has in fact responded and reacted to criticisms on many issues.[26] Most notably, it may well decide that Metropolitan should be left open.[27]

Much is made by plaintiffs of the City's alleged intransigence in cooperating with the investigation by HHS's Office of Civil Rights. Plaintiffs in *Boyd* have made this alleged failure to cooperate a separate cause of action, arguing it demonstrates discriminatory purpose. HHS has submitted a detailed chronology of events relating to its investigation, which commenced even before the Mayor's Report was issued, including voluminous correspondence. HHS asserts, moreover, that the City is substantially responsible for the delays in its investigation, although it concedes that the delay in conducting a patient census of the entire municipal hospital system was also caused by its own faulty planning and design.

The City's position is simply that it has cooperated extensively with HHS and other agencies, has supplied great quantities of information, and has permitted several surveys, including the extensive census presently undertaken. All this is incontrovertibly true, as reflected in HHS's submission and the affidavit of Deputy Mayor Wagner. But it is equally true that the City has resisted HHS, and has delayed the conduct of the desired survey. Nevertheless, the City's resistance could be deemed improper in its entirety, let alone racially motivated, only by someone convinced that the City had no legal justification for its positions. In fact, many of the grounds upon which the City has relied in delaying HHS seem eminently sound. Mayor Koch's ten-page letter of January 21, 1980, to Secretary Harris of HHS,[28] and the extensive memo-

cant percentage of self-pay patients pay in full or in part. Defendants' Post-Trial Mem., pp. 61–62.

**25.** See, for example, the City's analysis of transportation time to alternative hospitals. Note 13, *supra*.

**26.** For example, in its June 1979 estimate of savings to be generated by closing Sydenham, the Mayor's Health Policy Task Force Plan assumed that 20 percent of Sydenham's patient days would not reappear in the municipal hospital system. Paul Dickstein, the Deputy Director of OMB testified that as a result of persistent criticism of that figure, the City, in revising its savings estimate, cut the figure in half and assumed that only ten percent of Sydenham's patient-days would not reappear in the system. (Tr. 1418–20)

**27.** Deputy Mayor Robert F. Wagner, Jr., states in an affidavit, filed on May 13, 1980 (p. 2): "In fact, there are still ongoing, good faith, negotiations with responsible federal officials with regard to alternatives to closure of inpatient acute care services at Metropolitan, and I am an active participant in such discussions."

**28.** On January 9, 1980, Secretary Harris wrote to Mayor Koch expressing concern over reports of "deteriorating conditions" at the hospitals marked for closure. She also advised him of the HHS Office of Civil Rights' intention to proceed with a patient census of all municipal hospital services. (Attachment 23 to Cheatham Aff.) In response, Mayor Koch wrote to Secretary Harris on January 21, 1980 expressing the City's willingness to cooperate with HHS's investigation, but reiterating serious doubts previously noted by the City, concerning HHS's proposed 30-day census. These included questions as to why an ambulatory care census was required in light of the fact that ambulatory services would not be cut by the City's plan for Sydenham and Metropolitan, and in light of the City's assertion, supported by a previously submitted report, that ambulatory care in Harlem would actually be improved. Of particular concern to the Mayor was the fact that the census "would involve literally hundreds of thousands of patient interviews, at significant cost in terms of dollars (which HEW has not offered to pay) and administrative disruption. . . ." The bulk of the Mayor's letter dealt with concerns raised by the City's statistical expert, Dr. Fairley, as to the need for, and statistical validity of, the proposed inpatient census.

The Mayor's letter reveals that he and his advisors were concerned with the precise questions that trouble this Court about HHS's approach to the statistical issues and to the disparate impact issue, see discussion *infra*. The Mayor asked: "How is 'harm' to minority persons to be defined in the present context?

randum of Dr. Fairley on the deficiencies in HHS's planned census and in its statistical theories, are cogent and reasoned presentations of the City's position. One would think that the mayor of a city would not only have the right but the duty to prevent an ill-planned, enormously costly survey, designed to obtain information of questionable utility for any analysis under Title VI. The points made by the Mayor and his expert are not the statements of individuals resisting the investigation of their racial animus, as anyone who would read these letters can readily recognize. The position papers are in large part penetrating, logical and constructive, and are the product of the belief that HHS's view of the law under Title VI is simplistic, erroneous, and will lead to massive and unwarranted interference with local government planning. In fact, the City's resistance led to substantial modifications in HHS's plans. And since this court shares the City's view of HHS's authority under Title VI, it could hardly conclude that reasoned efforts to limit HHS's legal positions should be viewed as evidence of discriminatory purpose.

In sum, plaintiffs' contentions based on discriminatory purpose are frivolous. No evidence of racial animus has been presented in this case, subjective or objective, direct or indirect. Even the disparate impact which plaintiffs assert will occur has no value in establishing improper motive. The strength of plaintiffs' feelings—based on humane considerations and their own views on the way to improve health services—is no substitute for evidence on their legal claim. It appears certain they will fail to establish that the closure of Sydenham would violate the Fourteenth Amendment.

How is disparate racial impact to be measured? . . . While the problems of definition and setting standards for analysis and measurement are admittedly difficult, we think fairness requires that those problems be addressed now, not later, and that we be permitted to participate with you in that process." In light of the City's financial difficulties and the Mayor's responsibilities as an official entrusted with public funds, his approach on this issue was understandably cautious. His letter concludes with

### B. Claimed Violation of Title VI

The second basis upon which plaintiffs argue they are likely to succeed on the merits, or respecting which they have raised sufficiently serious questions going to the merits, is the claimed violation of Title VI. They are joined in this contention by HHS, which supports the plaintiffs' theory and which now contends that the City should be required to keep Sydenham open until HHS has completed its investigation. Although the Title VI claims present interesting and important issues of law, they fail to establish in this case any likelihood that plaintiffs will succeed or a sufficiently serious question on the merits so as to create a fair ground for litigation. For while the legal questions themselves are serious and close, the facts are such that defendants seem likely to succeed even if the standard of law most favorable to plaintiffs were adopted.

### 1. Title VI and the Equal Protection Standard

One of the great unsettled questions of civil rights law is whether Title VI of the 1964 Civil Rights Act incorporates the discriminatory purpose standard established by *Washington v. Davis, supra,* for violations of equal protection. If it does, then plaintiffs have failed to raise even a substantial question on the merits, since no evidence of discriminatory purpose has been shown to exist with respect to the City's decision to close Sydenham. Plaintiffs and HHS argue, however, that Title VI is less restrictive than the Constitution whenever the effect of the challenged conduct is to disadvantage minorities.

The statute itself lends little support to plaintiffs' contention. It states (42 U.S.C. § 2000d):

detailed assurances to the Secretary that the City will not allow a *de facto* closure of the hospitals. (Attachment 30 to Cheatham Aff.) On March 5, 1980, Under Secretary of HHS, Nathan Stark, on behalf of Secretary Harris, responded to the Mayor's letter, setting forth HHS's interpretation of Title VI's compliance standard. He insisted on HHS's need to conduct a 14 day system-wide census to collect data to determine compliance with its standard. (Attachment 35 to Cheatham Aff.)

No person in the United States shall, on the grounds of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Although the statute explicitly protects against "discrimination" on the grounds of race, color or national origin, plaintiffs argue that the context in which it was adopted justifies a standard different from that adopted in *Washington v. Davis*. Passed in 1964 as part of a package of laws, designed to deal with the pervasive discrimination in our society, plaintiffs contend Title VI's purpose was remedial, not punitive, and designed to ensure minorities equal participation in the benefits of federal expenditures, not merely to punish persons who act with racial animus. The Act sought to remove barriers which *in fact* limit minority participation in federally funded programs, HHS notes, and President Kennedy described it as intended to prevent federal moneys, raised from taxpayers of all races, from being "spent in a way which encourages, entrenches, subsidizes or *results* in racial discrimination." 109 Cong.Rec. 1161 (emphasis added). Health care programs were clearly among those to which the law was intended to apply.

Until recent years, plaintiffs and HHS might have derived considerable support for their position from *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). In *Lau*, the Supreme Court considered whether the San Francisco school system, which had been ordered to integrate by federal court decree, was violating Title VI by excluding non-English speaking students of Chinese ancestry from meaningful participation in, and the benefits of, an education financed in part with federal funds. The evidence established that, of 2,856 Chinese students who spoke no English, about 1,800 received no supplemental courses in the English language. Statistical evidence in *Lau* revealed that programs receiving federal funds effectively foreclosed an identifiable racial group from receiving the benefits of the program. The Court ruled that the school system's failure to provide bilingual and remedial instruction to non-English speaking students violated Title VI, upholding in the process an HEW regulation establishing an "effect" standard:

Discrimination is barred which has that *effect* even though no purposeful design is present: a recipient "may not . . . utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination" or have "the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin." *Id.*, § 80.3(b)(2).

414 U.S. at 568, 94 S.Ct. at 789 (emphasis in original).

The Court in *Lau* was of course spared the task of deciding whether Title VI incorporates the constitutional standard requiring proof of discriminatory intent; that standard was not constitutionalized until 1976 in *Washington v. Davis, supra*. But the opinions in two recent Supreme Court cases, *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), and *Board of Education v. Harris, supra*, strongly indicate that, were the issue squarely presented today, a majority of the Justices would hold that *Lau* no longer controls, and that the standard of discrimination in Title VI is the same standard the Court has established for discrimination under the Fifth and Fourteenth Amendments.

In *Bakke*, the Supreme Court considered whether an admission program for disadvantaged racial minority students adopted by the Medical School of the University of California at Davis violated the Equal Protection Clause of the Fourteenth Amendment and Title VI. In the opinion of the Court, after reviewing the congressional debates on Title VI, Justice Powell concluded that Congress had intended to incorporate a constitutional standard into Title VI due to the "repeated refusals of the legislation's supporters precisely to define the term discrimination." 438 U.S. at 286, 98 S.Ct. at 2746. Justice Powell stated:

The concept of discrimination, like the phrase equal protection of the law, is susceptible of varying interpretations, for as Mr. Justice Holmes declared, "[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to circumstances and the time it is used." *Id.* at 284, 98 S.Ct. at 2745. And turning to Title VI, Justice Powell found "the clear legislative intent, [that] Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause or the First Amendment." *Id.* at 287, 98 S.Ct. at 2747.

Though inconclusive on the issue presented here, Justice Powell's opinion in *Bakke* strongly suggested that he would interpret discrimination in Title VI to be congruent with the constitutional standard.[29] He removed any doubt as to his view when he joined the dissent in *Board of Education v. Harris, supra.*

Justice Brennan, writing in *Bakke* for Justices White, Marshall and Blackmun, and relying on a thorough and detailed analysis of legislative history, agreed that Title VI left "discrimination" undefined, incorporating the constitutional standard. Significantly, his review of the legislative history led him to the conclusion that Congress contemplated the standard might change with the passage of time:

> Congress' resolve not to incorporate a static definition of discrimination into Title VI is not surprising. In 1963 and 1964, when Title VI was drafted and debated, the courts had only recently applied the Equal Protection Clause to strike down public racial discrimination in America, and the scope of that Clause's nondiscrimination principle was in a state of flux and rapid evolution. . . . The congressional debate reflects an awareness of the evolutionary change that constitutional law in the area of

racial discrimination was undergoing in 1964.

> In sum, Congress' equating of Title VI's prohibitions with the commands of the Fifth and Fourteenth Amendments, its refusal precisely to define that racial discrimination which it intended to prohibit, and its expectation that the statute would be administered in a flexible manner, compel the conclusion that Congress intended the meaning of the statute's prohibition to evolve with the interpretation of the commands of the Constitution.

438 U.S. at 339–40, 98 S.Ct. at 2774.

Justice Brennan recognized the potential implications of his reading of congressional intent on the continued vitality of *Lau* following *Washington v. Davis:*

> We recognize that *Lau*, especially when read in light of our subsequent decision in *Washington v. Davis*, 426 U.S. 299, 48 L.Ed.2d 597, 96 S.Ct. 2040 (1976), which rejected the general proposition that governmental action is unconstitutional solely because it has a racially disproportionate impact, may be read as being predicated upon the view that, at least under some circumstances, Title VI proscribes conduct which might not be prohibited by the Constitution. Since we are now of the opinion, for the reasons set forth above, that Title VI's standard, applicable alike to public and private recipients of federal funds, is no broader than the Constitution's, we have serious doubts concerning the correctness of what appears to be the premise of that decision.

*Id.* at 352, 98 S.Ct. at 2780.

Although Justice Brennan and the three Justices who concurred in his opinion went on to assume *arguendo* the vitality of the rationale of *Lau*, one cannot ignore the strong views expressed by these four Justices on the issue presented here.

The position of the Supreme Court with regard to the standard for proving discrimi-

---

**29.** Plaintiffs' contention that Justice Powell "explicitly reaffirmed" the holding of *Lau* is overstatement. The Justice merely described the case and its remedy in rebutting petitioner's argument that the case supported "the proposi-

tion that discrimination favoring racial or ethnic minorities has received judicial approval without the exacting inquiry ordinarily accorded 'suspect' classifications." *Id.* at 303, 98 S.Ct. at 2755.

nation under Title VI was further clarified in *Board of Education v. Harris, supra.* In that case the Court held, *inter alia,* that a discriminatory impact standard is mandated in cases to which the 1972 Emergency School Aid Act ("ESAA"), 20 U.S.C. §§ 1601–1619, applies. The Court, in light of its holding, found no need to determine explicitly whether Title VI incorporates the constitutional standard. But the majority suggestively noted that "[i]t does make sense to us that Congress might impose a stricter standard under the ESAA than under Title VI of the Civil Rights Act of 1964." 100 S.Ct. at 374.

The dissenting Justices in *Board of Education v. Harris,* Stewart, Powell and Rehnquist, thought an intent standard should be applied even to the ESAA. Their feelings as to Title VI and the impact of *Bakke* were equally clear:

> Title VI has been construed to contain not a mere disparate impact standard, but a standard of intentional discrimination. In *Regents of University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750, five members of the Court concluded that Title VI, which prohibits discrimination in federally funded programs, prohibits only discrimination violative of the Fifth Amendment and the Equal Protection Clause of the Fourteenth. *Id.,* at 281–287, 98 S.Ct. at 2744–2746 (Powell, J.); *Id.,* at 328–355, 98 S.Ct. at 2768–2781 (Brennan, J., joined by White, Marshall, and Blackmun, JJ.). Those constitutional provisions, in turn, have been construed to reach only purposeful discrimination. *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851; *Arlington Heights v. Metropolitan Housing Dev.*
> *Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450; *Washington v. Davis,* 426 U.S. 299, 96 S.Ct. 2040, 48 L.Ed.2d 597; *Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548. It thus follows from *Bakke* that Title VI prohibits only purposeful discrimination.

*Id.* 100 S.Ct. at 379.

Plaintiffs attempt to minimize the import of these opinions by characterizing them as "confusing *dicta.*" They are not so easily dismissed. They appear to represent the views of at least seven Justices. The reasoning underlying these "*dicta,*" moreover, and in particular Justice Brennan's penetrating analysis of the legislative history Title VI, strongly indicate that the Court will find that the standard of discrimination under Title VI has evolved, and was intended to evolve, parallel to the standard embodied in the equal protection clause. At present this standard is one of discriminatory motive, as described above.

The legislative history cited by plaintiffs to avoid this conclusion is at best ambiguous. It does seem as plaintiffs argue, that Congress was worried that grants of federal funds might "result" in discrimination. But as Justices Powell and Brennan point out in *Bakke,* Congress left "discrimination" undefined. "Result" in the statutory context merely modifies "discrimination," which in turn can readily be construed to require that federal funds should not be used to facilitate race-conscious deprivations.[30] Even Senator Humphrey's opinion, quoted by plaintiffs, that the scope of coverage of Title VI extended beyond the scope of the Constitution, is of little value here.[31] Senator Humphrey appeared to be

---

**30.** Statements in the legislative history that repeat the common notion that tax monies should "be used to assist all Americans on an equal basis," 110 Cong.Rec. 6566, or to provide them "equal benefits without regard to the color of their skin," *id.* at 6561, do not compel a different conclusion. That Congress was concerned with "equality" sheds little light on the intent-impact inquiry. In any event, these isolated statements relied on by plaintiffs are not necessarily inconsistent with the view that Congress wanted to ensure that federal spending furthered constitutionally defined notions of equality.

**31.** Senator Humphrey stated:
> In many instances the practices of segregation or discrimination, which Title VI seeks to end, are unconstitutional. This is clearly so wherever Federal funds go to a State agency which engages in racial discrimination. It may also be so where Federal funds

concerned with cases in which insufficient state action existed to invoke the Constitution. He was not concerned with whether Title VI's standard for defining illegal discrimination, even in purely private endeavors, is parallel to that contained in the Constitution. Plaintiffs also argue that at the time Congress enacted Title VI the equal protection clause was believed to prohibit actions having a discriminatory impact, irrespective of motive. But even if this argument accurately states the law as of 1964,[32] the *Bakke* opinions seem authoritatively to adopt the view that the legislative history proves Congress' desire to have the Title VI standard evolve with the standard of the equal protection clause.

### 2. *Title VI and Disparate Impact*

Plaintiffs' strongest argument rests on the significance of regulations adopted pursuant to Title VI by HHS and by several other federal agencies. Pursuant to express statutory mandate, HHS has promulgated regulations under Title VI to be applied in the programs it supports. The regulation contains a non-inclusive definition of some specific discriminatory practices. 45 C.F.R. 80.3(b)(1) It explicitly prohibits, *inter alia*, actions which on grounds of race, color or national origin, "[r]estrict an individual in any way in the enjoyment of any advantage or· privilege enjoyed by others receiving any service . . .", or afford them an opportunity to participate in a federal assisted program "which is different from that afforded others under the program. . . ." 45 C.F.R. § 80.1(b)(1)(iv) and (b)(1)(vi). The regulations go on to preclude not only those actions which intentionally discriminate but those actions

which have the "effect" of discriminating against protected classes:

> (2) A recipient, in determining the types of services . . . or in determining the situations in which such services . . or facilities will be provided . . . may not . . . utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination . . . or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.
>
> (3) In determining the site or location of facilities, an applicant may not make selections with the effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination . . . or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the Act or this regulation.

45 C.F.R. § 80.3(b).

In accordance with these regulations, plaintiffs contend that a *prima facie* violation of Title VI can be established by proof that the City's decision to close Sydenham has a "disproportionate impact" upon minorities. The federal government has submitted papers in support of this view of the law, but takes no position on its application in this case. Plaintiffs and the government contend further that a *prima facie* case can be rebutted only if the City proves that its actions are necessary to achieve legitimate objectives unrelated to race, color or national origin, and that these objectives cannot be achieved by other measures which have a less disproportionate impact.[33]

---

go to support private, segregated institutions. . . . In all cases, such discrimination is contrary to national policy, and to the moral sense of the Nation. Thus, Title VI is simply designed to insure that Federal funds are spent in accordance with the Constitution and the moral sense of the Nation.
110 Cong.Rec. 6544.

**32.** *To support their view, plaintiffs rely primarily on* Monroe v. Pape, *365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). While that case held*

that proof of specific intent was not necessary to prove the illegality of a search and seizure under 42 U.S.C. § 1983, it did not in any way construe the equal protection clause.

**33.** Plaintiffs claim that this burden-shifting analysis of the regulations and statute is one which has been adopted by HHS's Office for Civil Rights. *See, e. g.*, Exhs. F and I to plaintiff's motion for a preliminary injunction as to Metropolitan Hospital.

At the time HHS adopted its regulations, six other federal agencies promulgated regulations that also incorporated a disparate-effect standard. 29 Fed.Reg. 16274–16305. On July 5, 1973, several years later, these agencies published amendments which, among other things, prohibited site location decisions having a disparate impact upon minorities. Congress has at no time sought to prevent enforcement of these regulations, even though HHS's disparate impact standard was specifically upheld in *Lau*. In fact, plaintiffs note, Congress failed to adopt Senator Ervin's suggestion to amend Title VI to require a showing of intentional discrimination. Lower courts have, moreover, enforced HHS's regulations on this subject, even after *Bakke*. See, e. g., *NAACP v. Wilmington Medical Center*, 453 F.Supp. 280, 308 (D.Del.1978), *rev'd and remanded on other grounds*, 599 F.2d 1247 (3d Cir. 1979). Finally, HHS presses the established principle that courts must accord great weight and deference to agency interpretations of legislation they are called upon to enforce. "[T]he validity of a regulation . . . will be sustained as long as it is 'reasonably related to the purpose of the enabling legislation.'" *Mourning v. Family Publications Svc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973); *Ford Motor Credit Co. v. Milhollin*, —— U.S. ——, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980).

■ If Title VI was intended to incorporate the constitutional standard of discrimination, as most Supreme Court Justices seem to have concluded, then Congress' inaction is even less significant than usual. The decision to incorporate the constitutional standard is implicitly one that leaves the process of construction to the courts. Furthermore, that HHS's regulation was upheld in *Lau* seems of little importance. Not only has that ruling been seriously questioned, the facts there were dramatically different from those in the present case, and would justify reaching the same result even if Title VI were construed to include a standard of discriminatory purpose. This is because HHS may—and should—be recognized to possess authority to adopt regulations that facilitate enforcement of Title VI

without changing its fundamental meaning. On the other hand, no agency may lawfully adopt a standard by regulation that squarely conflicts with the standard which has been legislated by Congress or authoritatively adopted by the courts.

In this case HHS's regulations, and its "informal" interpretations of those regulations contained in letters and other communications, conflict squarely with the constitutional standard of *Washington v. Davis*, in two crucial respects. First, they dispense entirely with the need for the agency to make a finding of racial "discrimination" as a predicate for ultimate relief. True, the regulations continue to use the word "discrimination" at various points, and could therefore be construed to be consistent with the constitutional standard. But HHS has chosen to construe and apply its regulations otherwise, arguing that Title VI permits an "effects" test, and that this is proper because Title VI is designed to assure the result in fact of equal access to all federal spending programs.

The second conflict between HHS's interpretations and the constitutional standard is in the type of evidence that it has concluded will establish a "prima facie" case and thereby impose a burden of justification on the recipient. For HHS to give weight to a racial disparity is of course necessary, not merely permissible. Furthermore, a regulation that has the evidentiary consequence of placing a burden of justification on a recipient when a legally sufficient racial disparity is established would appear to be reasonably within HHS's authority in protecting the integrity of federal expenditures. The problem with HHS's approach is that its perception of racial disparity has no logical relationship to the discriminatory purpose standard; rather, it is based on the agency's legal premise that a discriminatory purpose need not be shown.

HHS's definition of disparate racial impact is stated in letters and briefs, not in its regulations. The proposed test is simply:

whether there is any disparity between (a) the proportion of minority patients

who will be adversely affected, if any, as related to all minority patients using the HHC system, and (b) a similar proportion calculated for nonminority patients.

Govt's Supplemental Mem., p. 7 (April 28, 1980). This means that a "court need only determine whether the closings and reductions" will adversely affect a population that "is more minority than the system as a whole." Further, the standard is urged as desirable because it "obviates the need for statistical analysis," and can be applied through "a comparison of easily calculated ratios. . . ." The standard is claimed to be "neutral" in that it does not "prejudge the issues," and it "applies the Title VI prohibition against discrimination without abridging a municipality's prerogative to reduce its expenditures for health care." States the Government:

New York City is free to affect reductions, provided, however, that the population adversely affected by the reductions is no more minority than that of the system as a whole. If the City wishes to make specific reductions in services that will adversely affect minorities disproportionately, the objectives must be permissible and incapable of accomplishment through other less disproportionate means.

*Id.* at 8.

The Government's approach proves that simplicity is not always a virtue. The implications and consequences of its proposed standard are great. Any recipient of federal funds, from any Title VI agency, could be required to justify reducing any service, even if overall service increased, where the service is utilized by a minority population proportionately greater than the minority population served by the system as a whole. Of course the standard would apply to any minority group, and since many ethnic groups tend to live in close geographic proximity, many decisions to modify virtually any form of service or facility, would be affected. In fact, since we are speaking of Title VI, it is far from clear that the standard could be applied only to minorities; the Act prohibits discrimination against any race. *See Regents of the University of California v. Bakke, supra.* Whites may well be able to claim the benefits of HEW's "simple" test. The fact is that almost any decision to close any federally supported facility or to reduce any federally supported service will adversely affect one group disproportionately more than some other group.

The Government's assurance that its approach does not "prejudge" the issue is only too accurate. Its approach has nothing to do with the issue. The type of disparate impact it finds sufficient has no demonstrable relationship to the motive of decisionmakers. Little wonder that HHS abjures "elaborate statistical analysis." Any disciplined analysis would reveal its formula for what it really is—a vehicle by which HHS, and the other Title VI agencies, may assert jurisdiction to review the merits of, and to require justification for, virtually all important decisions by federal fund recipients. This is not to say that these agencies will rush in to correct local or state decisions, or will provide a forum for serious evaluation of options, or will issue declarations upholding the reasonableness and need for painful determinations to help administrators face a community's disappointment and wrath. But the power to inquire, and to demand explanation, provides leverage that will inevitably delay or discourage many nondiscriminatory and essential decisions. In fact, HHS's approach here is an even more grossly simplified analysis of disparate impact than that proposed by plaintiffs' expert, Richard Faust, who made clear that the analysis he proposed was not related to an inquiry into the motive of decisionmakers.

HHS suggests, by the fact that its proposed standard is written with New York City expressly in mind, that this test will be applied only to hospital systems such as New York's. That result would be especially pernicious, and would constitute an ad hoc rule that has the effect, whatever its motive, of restricting the City's flexibility despite its relative generosity to its poor. Of the 27 municipal hospitals in this nation,

the City funds 17. Many are located in heavily minority areas; for example, 3 or 4 Manhattan hospitals are in or adjoin Harlem. The effect of HHS's rules, therefore, will be to enable the federal government to prevent or delay most major modifications in service, even as the federal government's fiscal policies force the City to pay a substantial part of its total hospital costs. The standard HHS suggests could not have been better designed to discourage other cities or states from following New York City's example in serving its needy.

██ Furthermore, the Government's approach does prejudge a very important issue in the Title VI context. It may not result in findings of discrimination, as sophisticated statistical analysis sometimes allows, but it far too readily shifts to cities and states the burden of justifying many governmental decisions. The record of this proceeding, and the record and opinion in a similar case in Delaware,[34] provide only a hint of the difficulty and cost HHS's burden of justification will frequently impose. Before this burden of justification is itself justified, at least some evidence of disparate impact probative of discriminatory motive should be established.

██ No such proof is present in this case; the only evidence of disparate impact concerning Sydenham is the simple fact that proportionately more minorities use that hospital than use the municipals in the City of New York. For HHS this would be enough to shift the burden, even though it is nothing more than the necessary consequence of closing that particular facility. Curiously, had the City chosen to close a hospital serving many more minority citizens, but fewer proportionately than utilized the system as a whole, no justification would have been necessary, at least under this rationale. And had the City but one hospital to close, or been driven to closing them all, HHS's approach would require no further inquiry despite the devastating consequences that might follow for the minority poor.

██ In addition to its departures of principle from the constitutional standard, HHS's recommended approach to the issues in this particular case imposes an additional, unjustified burden upon the City by requiring an examination of "adverse effect" even before a disparate impact has been ascertained. This particular device is theoretically consistent with the constitutional standard, in that proof of adverse effect would be necessary to justify any relief for a constitutional violation. But by this approach HHS turns the proof of claims under Title VI upside down. It places a city or other recipient of federal funds under the burden of submitting proof relating to adverse effect even though further inquiry may establish that no racially disparate impact occurred. Title VI is no guaranty against adversity. It protects against discrimination.

██ Although HHS's informal opinions and recommendations under Title VI are invalid, the basic approach of its regulations is sound. To subject HHS and other federal agencies responsible for monitoring federal expenditures to the same procedural standards applicable to private litigants would undermine the utility of Title VI. HHS should be permitted to impose a burden of justification whenever evidence is developed of a disparate impact probative of discriminatory motive. This would not justify a finding of discrimination under *Washington v. Davis*, but it would enable HHS to examine the justifications advanced to ascertain whether evidence for such a finding had been developed. For this reason, at the least, decisions such as *Lau* and *Board of Education v. Califano*, 584 F.2d 576 (2d Cir. 1978), *aff'd sub nom. Board of Education v. Harris, supra*, should retain their validity.[35]

---

34. See the 131 page opinion by Chief Judge Latchum in *National Association For the Advancement of Colored People v. Wilmington Medical Center*, 290 F.Supp. 491 (D.Del. 1980).

35. The Second Circuit's decision in *Board of Education v. Califano* rests on a record in which uncontroverted statistical evidence showed that academic high schools in the central school district had full time faculties with

■ Finally, the record in this case was compiled in part to permit a judgment as to the legality of closing Sydenham even if HHS's approach were deemed valid. The burden of justification that the City would face, if a "disproportionate adverse effect" were found, would be:

to establish that (1) the closings and reductions are necessary to achieve legitimate objectives unrelated to race, color or national origin; and, (2) these objectives cannot be achieved by other measures which have a less disproportionate adverse effect.

Govt's Supplemental Mem., p. 5. The evidence establishes that the closing of Sydenham has been undertaken by the City to achieve the legitimate objectives of reducing expenditures and increasing efficiency, both unrelated to race, color or national origin. Furthermore, the closing of Sydenham is an objective that cannot be achieved without at least some adverse consequences, having what HHS calls a "disproportionate adverse effect." The City has convincingly demonstrated that it has a reasonable basis for cutting health service costs, as a matter of equity and necessity, and that Sydenham is the one item which it is most justified in cutting.

HHS's language could require much more than the findings made above. It could be read to require a searching inquiry into all the City's budgetary options, both at HHC and in other service areas. If that is what Title VI allows, one would think that HHS should be the institution to conduct the inquiry. There is nothing in the present record to render unreasonable the City's determinations.

## III. *Irreparable Harm and Balance of the Equities*

■ Because plaintiffs have failed to meet their burden on the merits of this case, no discussion of irreparable harm is necessary. But even assuming that plaintiffs' position were correct, or that there were substantial questions to be resolved, preliminary injunctive relief in this case would still be unwarranted. The fact that closing Sydenham will have some effect on the community it now serves is insufficient to find irreparable harm in the circumstances of this case; decisions to cut services like this one inevitably involve adverse consequences of some degree. And given the City's demonstrated need to effect major cost-savings, the possible effects in this case are not substantial compared to the effects of another equally cost-effective hospital closing.

As noted above, Sydenham is the smallest hospital in the municipal system, and its closing will thus affect a comparatively small number of persons now served by the municipal system. Moreover, adequate alternative treatment appears available for most, if not all, of these persons, with no significant increase in travel time. See generally notes 13–22, *supra,* and accompanying text. In any event, any inconvenience due to travel changes in this case do not rise to the level of harm necessary to enlist the equitable powers of this court. Cf. *Jackson v. Conway,* 476 F.Supp. 896 (E.D.Mo.1979).

While the community's fears about true life-threatening cases are understandable, such cases constitute only a small fraction of total emergency visits, and assurances have been given that sufficient ambulance

"a percentage of black teachers at or below two standard deviations" from the expected distribution if teacher assignments had been randomly made. "These substantial disproportions are not contested by the appellants," the Circuit Court noted, "nor do they deny that the schools were statistically 'racially identifiable' as a result of the significant disparities in staff assignments." 584 F.2d at 584–85. The disparities were identified through binominal analysis and easily met the standard adopted by the Supreme Court for jury discrimination cases in

*Castaneda v. Partida,* 430 U.S. 482, 496–97 n. 17, 97 S.Ct. 1272, 1281, 51 L.Ed.2d 498 (1977), and explained by the Circuit Court, 584 F.2d at 584 n. 29. Although this statistical proof may have been insufficient to establish purposeful or intentional discrimination, it was powerful and reliable evidence of such discrimination and should be sufficient to permit an agency to impose a burden of justification or explanation in administering the expenditure of federal funds under a program governed by Title VI.

service will be provided. Furthermore, in assessing the degree and nature of the possible harm, it is essential to recognize that changes in governmental services almost inevitably involve tradeoffs. Some of the individuals now served by Sydenham will suffer inconvenience and even less effective care. But, at the same time, many other Sydenham patients stand to gain by the improvement in the overall quality of care which will be available at alternative clinic and hospital facilities that defendants have shown to exist. *See United States v. Bexar,* 484 F.Supp. 855 (N.D.Tex.1980).

In fact, as indicated above, plaintiffs' alternative claim for preliminary injunctive relief in this case has been satisfied, in that the City has demonstrated to this Court's satisfaction that alternative inpatient and emergency facilities are available for Sydenham patients without unreasonable burdens. See note 6, *supra.* These findings that satisfy plaintiffs' alternative request for preliminary relief, would appear to be strong evidence that plaintiffs have failed to demonstrate irreparable injury.

Finally, in considering the question of irreparable harm in a case such as this, the possible adverse effects on the plaintiffs should be balanced against the adverse effects injunctive relief would likely have on the capacity of elected and appointed officials to govern effectively. The dispute over closing Sydenham has been the subject of great public concern for many months, if not years. The difficult issues raised have been thrashed out in several arenas. Whatever this court may think of the decision to close Sydenham as a matter of public health policy, the City appears to have properly considered all the relevant factors and alternatives in reaching its decision in the face of fierce, often emotionally-charged opposition.

Under these circumstances, a substantial showing should be required before a federal court adds yet another obstacle in the necessarily painful decision-making process. Particularly during the current fiscal crisis, the strong public interest in effective and economically sound local government is an important factor to be weighed in the equitable balance. At least some reasonable chance of success on the merits and evidence of greater possible harm should be required before a federal court adds to the difficulty and cost of our local and state governments by enjoining long-considered decisions pending final, often long-delayed, judicial determinations.

Accordingly, plaintiffs' motion of preliminary relief is hereby denied. F.R.C.P. 65.

SO ORDERED.